839 F.2d 400
 44 Ed. Law Rep. 1055
 In re Craton LIDDELL, et al. v. BOARD OF EDUCATION OF the
CITY OF ST. LOUIS, MISSOURI, et al. (Two Cases).
RITENOUR SCHOOL DISTRICT, Appellant,
v.
The STATE OF MISSOURI, Appellee.
Parkway School District, Amicus.
ROCKWOOD SCHOOL DISTRICT, Appellant,
v.
The STATE OF MISSOURI, Appellee.
 Nos. 86-2193, 86-2359.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1987.
Decided Feb. 4, 1988.
Rehearing En Banc Denied March 14, 1988.
 
 John Gianoulakis, St. Louis, Mo., for appellant.
 Robert L. Presson, Asst. Atty. Gen., Jefferson City, Mo., for appellee.
 Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 Ritenour School District and Rockwood School District submitted requests to the district court for reimbursement by the State of Missouri for expenses incurred in accepting black transfer students from the City of St. Louis School District pursuant to the settlement plan in the St. Louis school desegregation case. The district court granted Ritenour partial payment and denied Rockwood's request. We affirm in part and reverse in part as to Ritenour, and reverse as to Rockwood.
 
 BACKGROUND
 
 2
 In March, 1983, twenty-three county schools and the City of St. Louis School District entered into a settlement agreement with the plaintiffs in the St. Louis school desegregation case. This Court approved the settlement agreement and detailed a plan for the desegration of the St. Louis schools. See Liddell v. State of Missouri, 731 F.2d 1294 (8th Cir.) (en banc), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984) (Liddell VII ). We found the State of Missouri to be a constitutional violator, id. at 1298-99, and held that it must, with certain exceptions, abide by the terms of the settlement agreement. Id. at 1309.
 
 
 3
 The settlement plan requires the voluntary interdistrict transfer of black students from the City of St. Louis school system to the county school districts. The transfers serve two purposes: (1) to provide the transfer students and the suburban students with an integrated education; and (2) to reduce the number of students in the St. Louis schools, particularly in the nonintegrated schools. The State is obligated to fund much of the interdistrict plan. Id. at 1301-09.
 
 
 4
 Liddell VII established that 15,000 black students from the city would be transferred to county schools over a period of years. Significant progress has been made toward that goal. The numbers of transfers has steadily climbed from 2,294 in 1983-84, see 731 F.2d at 1302, to almost 12,000 in the current school year. See Voluntary Interdistrict Coordinating Committee Report of November 4, 1987, at 10.
 
 
 5
 Both Ritenour and Rockwood have growing numbers of resident and transfer students.[1] Ritenour requests reimbursement from the State for some of the costs of reopening a closed elementary school. Rockwood requests reimbursement for the building of more classroom space to accommodate the transfer students.
 
 ANALYSIS
 
 6
 In issue in this case is section X.B.3 of the settlement plan which provides for reimbursement for a county district's "one-time extraordinary costs (other than hiring of personnel) such as the costs associated with reopening a closed school." Both Ritenour and Rockwood claim that they are entitled to reimbursement under this section.
 
 
 7
 The State makes a number of arguments which apply to claims of both school districts.[2] It initially contends that Ritenour and Rockwood are not entitled to any reimbursement by the State for capital expenditures for the reopening or the creation of classroom space to accommodate transfer students. It points to Liddell VII in which the Court en banc disapproved that portion of the settlement plan under which the county districts were to be reimbursed for capital costs for establishing county magnet schools. See 731 F.2d at 1312. It argues that the Court decided that reimbursements for capital expenditures in the county school districts were beyond the scope of the proper remedy. This argument is without merit.
 
 
 8
 The State must abide by the terms of the settlement plan. See id. at 1302-09. The Court en banc stated: "Interdistrict transfers between the city and the county schools may proceed pursuant to the settlement agreement," subject to certain exceptions. The Court did not except the State from paying the capital costs due to interdistrict transfers as directed in section X.B.3. See id. at 1309. Liddell VII therefore did not insulate the State from liability for capital costs to accommodate transfer students in the county schools.
 
 
 9
 Second, the State contends that the question of the need for additional space for transfer students should only be considered on the basis of the county as a whole. It argues that unless Ritenour and Rockwood can show that other county districts do not have space, their request to be reimbursed for the creation of additional space should be denied.
 
 
 10
 The settlement plan does not establish such a requirement. Nor does it limit transfer students to those districts which have existing space to accommodate them.[3] Instead, it specifically permits districts to seek reimbursement for capital costs. In Liddell VII, we stated that "complementary zones" which would limit the choices of the schools which transferees could attend would undermine the voluntary nature of the settlement agreement. See id. at 1309. We view the State's present argument in a similar light. A requirement that a district cannot build to accommodate transfer students unless no other district has space would seriously limit the choices available to transfer students. We therefore reject the State's argument.
 
 
 11
 Third, the State contends that Ritenour and Rockwood are not short of space. It argues that Ritenour and Rockwood would be able to accommodate the additional transfer students by raising their pupil to teacher ratios. We will not require either school to take that action. It was not the intent of the settlement agreement or of this Court to require suburban schools to lower their standards as a condition of participating in the voluntary interdistrict desegregation plan.
 
 
 12
 Finally, the State contends that the per pupil reimbursements paid by the State under section X.B.1. of the settlement plan are sufficient to cover, not only the per pupil recurring costs, but also the costs of capital projects. We disagree.
 
 
 13
 Reimbursements for per pupil expenditures under section X.B.1. and reimbursements for one-time costs under section X.B.3. are distinct aspects of the settlement plan. The per pupil reimbursements under section X.B.1. are not in issue in this appeal. In any event, the record before this Court does not show that county districts are receiving reimbursements that are greater than their per pupil costs. In fact, Ritenour submitted evidence that in 1984-85, it received a per pupil reimbursement from the State of $2,270 but that its per pupil costs were $3,150.
 
 
 14
 We turn now to the individual budget requests of Ritenour and Rockwood.
 
 A. Ritenour
 
 15
 Ritenour objects to the formula adopted by the district court for determining the amount the State should reimburse it for the reopening of Buder Elementary School. Ritenour estimated the cost of reopening this school to be $587,000. It asked the State to pay $290,565. The State refused. Thereafter, Ritenour filed a budget request. A hearing was set before the Budget Review Committee (BRC).
 
 
 16
 Ritenour submitted evidence that its elementary schools were overcrowded; that in the previous year it could not accept more transfers because of the overcrowding; and that over the last several years, Ritenour had been forced to convert speciality rooms into regular classrooms. According to the evidence, as of June, 1985, Ritenour's elementary schools exceeded their "preferred capacity" by 486 students. The State submitted no evidence in rebuttal.
 
 
 17
 On June 6, 1985, the BRC filed its final report and recommendation with the district court. The report agreed with Ritenour that Buder had to be reopened, in part because of transfer students; that the $587,000 estimate for renovating Buder was reasonable; and that "Ritenour has deligently abided by the Settlement Plan provisions in the recruitment, assignment and education of transfer students." The BRC, however, recommended that only $108,783 be paid to Ritenour.
 
 
 18
 The BRC arrived at this figure by deducting "non-capital costs" such as books and instructional materials; by deducting funds which had been expended by the school district prior to approval by the district court; and by applying a special "proration factor." The "proration factor" was arrived at by dividing the number of additional transfer students in the coming school year by the total number of seats in Buder. Ritenour's estimates of the costs and the BRC's deductions from them break down as follows:
 
 
 19
 Proposed Expenditures (1986-87)
--------------------------------
 Equipment and Furniture $190,000
 Repair and Renovation 190,000
 Kitchen 44,000
 Instructional Materials 40,000
 Kitchen Exhaust System 15,000
Prior Expenditures (1985-86)
--------------------------------
 Roof Work 47,000
 Reading and Math 31,000
 Library Starter Kits 30,000
 --------
 Total Projected Cost of
 Reopening Buder - $587,000
 Deduct
 Recurring Operating Costs 43,865
 Expenditures Made Prior to
 District Court Approvel 108,000
 --------
 Net Capital Cost $435,135
 Multiply by Cost Proration
 Factor of 25% .25
 --------
 $108,783
 --------
 
 
 20
 We consider each of Ritenour's objections to the BRC's computation methods.
 
 
 21
 a. Books and Instructional Materials
 
 
 22
 Ritenour argues that section X.B.3. allows for reimbursement of some non-capital costs. It argues that the language of section X.B.3., "one-time extraordinary costs * * * associated with opening a closed school," includes all those items that must be in place and available for use when the closed school first reopens. The total amount paid or to be paid by Ritenour for the books and instructional materials for which it seeks reimbursement is $101,000.[4]
 
 
 23
 While we are not willing to conclude that "one-time extraordinary costs" can only embrace capital costs, we do not believe that Ritenour has demonstrated that the $101,000 paid for books and instructional materials are indeed "one-time extraordinary costs" which are not included in the yearly per pupil reimbursements. The definition of per pupil costs in section X.B.1.--"all costs for instruction and support services"--indicates that the per pupil reimbursements would cover the cost of the books and supplies. Absent some showing of different circumstances, payments for books and instructional materials are included in the per pupil reimbursements. We thus affirm the decision of the district court that Ritenour's budget request must be reduced by $101,000 or from $587,000 to $486,000.
 
 
 24
 b. Pre-Request Expenditures
 
 
 25
 Ritenour spent $47,000 to repair the roof of Buder school in the budget year prior to the one in which it filed the budget request. According to Ritenour, these repairs prevented deterioration of the building and ultimately reduced the cost of reopening Buder.
 
 
 26
 The district court held that these expenditures should not be reimbursable because a request for expenses already incurred circumvents established procedures and practices. We disagree with this ruling.
 
 
 27
 Neither the State nor the district court points to a specific rule prohibiting reimbursement for an expenditure made prior to a request. Nor, can we find a valid reason for such a rule. Ritenour reduced the cost of the repair and ultimately the State's liability by making the repair. Frugality and foresight should be encouraged.
 
 
 28
 The State, citing Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), contends that reimbursement for past expenditures would constitute a form of retroactive compensation barred by the eleventh amendment. This argument is without merit.
 
 
 29
 The eleventh amendment bars a suit by private parties "seeking to impose a liability which must be paid from public funds in the state treasury." Id. at 663, 94 S.Ct. at 1356. "[A] wide range of prospective relief 'which serves to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.' " Denke v. South Dakota Dept. of Social Services, 829 F.2d 688, 689 (8th Cir.1987) (citing Papasan v. Allain, 478 U.S. 265, ----, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986)); see also Liddell VII, 731 F.2d at 1308 n. 13 (approving the district court's funding orders in this case). The relief in issue here is prospective. The St. Louis school desegregation case is in the remedial stage. The failure of the State to pay Ritenour for the roof repair in question is not a past wrong for which Ritenour is attempting to hold the State liable. Rather it is a question of what the State must do now to conform its actions to the remedial relief already required. Thus, there is no eleventh amendment bar to this payment for past roof repairs.
 
 
 30
 c. The "Proration Factor"
 
 
 31
 Ritenour objects to the district court's use of the proration factor. Applying the proration factor, the district court allowed Ritenour reimbursement for only twenty-five percent of the capital costs for Buder. The district court observed that the State is only responsible for capital improvements necessary to the 12(c) plan. The district court viewed necessary expenses as including only the "additional capital expense incurred by Ritenour due to the admission of additional transfer students * * * (i.e., new elementary transferees for 1986-87)." The court estimated that about twenty-five of the students attending Buder would be transfer students.
 
 
 32
 The court recognized that all of the transfer students in the district contributed to the need for additional space. It presumed, however, that the students who had transferred prior to the 1986-87 school year were adequately accommodated, and thus only the additional transfer students and the growing number of resident students created the need for the reopening of Buder.
 
 
 33
 Ritenour argues that it should be reimbursed for fifty-five percent of its capital expenditure. The fifty-five percent payment was deemed necessary because Buder would create five hundred new seats and 273 transfer students were expected to attend the elementary schools in the Ritenour district. Thus, 227, or forty-five percent of the new seats would essentially be to accommodate the growing number of resident students.
 
 
 34
 We find Ritenour's reasoning persuasive. First, as Ritenour observes, the proration factor used by the BRC has never been applied in any past funding request.[5] We see no good reason to adopt it now. In addition, as the Ritenour formula recognizes, the number of transfer students already in the district has a continuing effect on the space available in existing school buildings. It is the lack of space in existing buildings, due in part to the transfer students already there, which necessitates the creation of more space. As Ritenour correctly points out, any other method of computation would lead to arbitrary results.
 
 
 35
 Under Ritenour's approach, a district is not compensated for "one-time extraordinary costs" unless it must create more classroom space to accommodate transfer students. Thus, if a school has excess space, the district would not be reimbursed for allowing transfer students to use that space. When new space is required, however, those transfer students already in the district must be taken into account, since their presence would for the first time affect the district's building plans.
 
 
 36
 The State should therefore reimburse the district to the extent existing and newly transferred students cause the need for new space. We thus hold that the State should reimburse Ritenour for fifty-five percent of the capital costs, or $267,300 ($486,000 X .55) for the reopening of Buder.
 
 B. Rockwood
 
 37
 Rockwood appeals an order of the district court denying its request for reimbursement from the State for the construction of ten additional classrooms.
 
 
 38
 Rockwood made its first request under section X.B.3. in 1984. Judge Hungate approved that request. Rockwood made the present request on April 1, 1986. The district court denied the request because "the plain meaning" of "one-time extraordinary costs" is that a "county school district can seek state funding of desegregation-related capital expenditures only once."
 
 
 39
 The question of Rockwood's request hinges on the meaning of "one-time" in the phrase "one-time extraordinary costs:" does it define the kind of costs (i.e., recurring versus non-recurring) which are reimbursable or does it define the number of times reimbursement can be sought? In our view, the district court erred in deciding that it limited the number of times reimbursement may be sought.
 
 
 40
 We start by observing that the district court essentially interprets the phrase to read that a district may seek reimbursement "only one-time for extraordinary costs." Such an interpretation, however, is not compelled by the language. To the contrary, a more reasonable interpretation is that one-time costs are those that do not recur on a regular basis, or put another way, costs for particular items whose useful life is, in theory, unlimited. See, e.g., United States v. Board of Educ., 621 F.Supp. 1296, 1350 (D.C.Ill.1985) (where the court notes in discussing a budget matter "that certain of the items funded in school year 1983-84 are one-time costs and will not recur in subsequent years"), vacated on other grounds, 799 F.2d 281 (7th Cir.1986). Such costs would be distinguishable from operational costs (such as salaries, supplies, and building maintenance) which recur on a regular basis.
 
 
 41
 In this case, the cost for the classrooms for which Rockwood sought reimbursement in 1984 are "one-time" costs in that those particular classrooms will not have to be replaced in the short-term. If Rockwood has to build more classrooms, the cost of those classrooms would be "one-time" in that the additional classrooms would also not have to be replaced in the short-term. In this way, both Rockwood's 1984 request and its present request would be for "one-time" costs.
 
 
 42
 The State contends that to read the phrase in such a fashion would render the term "extraordinary" superfluous. We disagree. First, we think that standing on its own, the term "extraordinary" as interpreted by the district court is unclear. The State argues that "extraordinary" costs refer to capital costs. This Court has examined a number of cases in which the term "extraordinary costs" is used, and in none of them is "extraordinary" synonomous with "capital." See, e.g., Regents of Univ. of California v. Heckler, 756 F.2d 1387, 1391 n. 6 (9th Cir.1985) (plaintiffs seeking "extraordinary costs associated with housekeeping and plant engineering"); Nevada Power Co. v. Watt, 711 F.2d 913, 921 (10th Cir.1983) (federal environmental statute listing extraordinary costs as those of "special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities"); Geneva Towers Tenants Org. v. Federal Mortgage Investors, 504 F.2d 483, 497 n. 6 (9th Cir.1974) (using "extraordinary costs" in terms of unanticipated costs in a case involving federal housing legislation). While these cases by no means resolve the meaning of "extraordinary costs," they certainly cast doubt on the State's interpretation.
 
 
 43
 We believe a more reasonable interpretation would be this: "extraordinary" means those costs which are due, not to ordinary operation of a school district for its resident students, but are due to the presence of transfer students from outside the school district. Thus, the full phrase "one-time extraordinary costs" would mean those non-recurring costs incurred as a result of the presence of the transfer students.
 
 
 44
 In addition, this interpretation of the language of X.B.3. is more fiscally prudent than the interpretation offered by the State. Under the State's interpretation, Rockwood should have made a complete budget request in 1984 which would have anticipated all the future capital needs necessitated by the transfer students. Such a request, however, would have to have been based on projections of the growth of the resident population and the number of transfer students who might choose to come to the district. It could have turned out to be grossly inflated, and the State would have had to reimburse the district for expenditures not required by the settlement plan.
 
 
 45
 In most instances it would be far more prudent to expand incrementally to avoid wasting money on classroom space that might not be needed for transfer students. This is precisely what Rockwood did. Such an approach is consistent with both the letter and spirit of the settlement plan. We therefore hold that that the district court erred in refusing to consider Rockwood's second budget request under section X.B.3.
 
 CONCLUSION
 
 46
 The district court did not err in rejecting Ritenour's request for reimbursement of $101,000 for books and instructional materials. It did, however, err in rejecting Ritenour's request for $267,300 to cover the capital costs in reopening Buder school, including the capital costs incurred in the year prior to Ritenour's budget request.
 
 
 47
 We reverse the district court's ruling regarding Rockwood's budget request. We remand the matter to the district court for reconsideration in light of this opinion.
 
 
 
 [1]
 Rockwood had a total of 826 transfer students in 1985-86, and 1,426 in 1986-87
 
 
 [2]
 The State concedes that it cannot seek to have the partial payment granted by the district court to Ritenour reduced, since it did not file an appeal or cross-appeal
 
 
 [3]
 In fact, section I.A.1(d) of the settlement plan specifically notes that "[t]here is no 'space available' condition on interdistrict transfers under the proposed settlement."
 
 
 [4]
 This amount includes $71,000 for books and instructional materials, a cost which Ritenour had incurred in the prior budget year, 1985-86
 
 
 [5]
 In an order of December 10, 1984, the district court (Judge Hungate presiding) approved a request of Rockwood school for $425,000. The court approved the request in full without applying a proration factor