686 F.Supp. 235 (1988)
Craton LIDDELL, et al., Plaintiffs,
v.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS, et al., Defendants.
No. 72-0100C(5).
United States District Court, E.D. Missouri, E.D.
May 10, 1988.
*236 William P. Russell, Joseph McDuffie, St. Louis, Mo., for Liddell, et al.
Michael A. Middleton, Columbia, Mo., William Taylor, Washington D.C., Wayne C. Harvey, St. Louis, Mo., for Caldwell/NAACP.
Craig M. Crenshaw, Jr., Jeremiah Glassman, U.S. Dept. of Justice, Educational Opportunities Litigation Section, Washington D.C., for U.S.A., Dept. of Justice, Civil Rights Div.
James J. Wilson, City Counselor, St. Louis, Mo., for City of St. Louis, Mo.
Anthony J. Sestric, St. Louis, Mo., for Collector of Revenue for the City of St. Louis.
Charles Werner, St. Louis, Mo., for Nat. Educ. Ass'n.
Charles R. Oldham, St. Louis, Mo., for Teacher's Local Union 420.
Shulamith Simon, St. Louis, Mo., for amicus curiaeCourt Appointed.
Kenneth C. Brostron, St. Louis, Mo., for Board of Educ. for the City of St. Louis (City Bd.).
Michael J. Fields, Asst. Missouri Atty. Gen., Jefferson City, Mo., for State of Mo.
Andrew J. Minardi, Joseph D. Ferry, St. Louis, Mo., for St. Louis County.
Joseph Neimann, Eric Schmitz, Timothy R. Kellett, St. Louis, Mo., for Special School Dist.
Henry D. Menghini, Robert J. Krehbiel, St. Louis, Mo., for Affton and Lindbergh.
Darold E. Crotzer, Jr., St. Louis, Mo., for Bayless, Jennings, Normandy and Wellston.
Bertram W. Tremayne, Jr., St. Louis, Mo., for Brentwood and University City.
*237 George J. Bude, St. Louis, Mo., for Clayton.
Frank Susman, St. Louis, Mo., for Ferguson-Florissant.
Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood.
Robert G. McClintock, St. Louis, Mo., for Ladue.
Richard Ulrich, James Sanders, St. Louis, Mo., for Maplewood and Richmond Heights.
John Gianoulakis, Mark Bremer, St. Louis, Mo., for Mehlville, Pattonville and Ritenour.
Donald J. Stohr, James Erwin, R.J. Robertson, St. Louis, Mo., for Parkway.
Edward E. Murphy, Jr., Garry Seltzer, St. Louis, Mo., for Riverview Gardens.
Douglas A. Copeland, Robert W. Copeland, St. Louis, Mo., for Rockwood and Webster Groves.
Kenneth V. Byrne, St. Louis, Mo., for Valley Park.

MEMORANDUM
LIMBAUGH, District Judge.
This matter is before the Court on the State's motion for clarification of the extent of its responsibility for funding of interdistrict transfers, L(1715)87, and its supplemental memo in support, L(1776)88. Hazelwood School District, certain county school districts, Parkway School District, the City Board, the Caldwell-NAACP plaintiffs, Liddell plaintiffs, and the City of St. Louis have filed responses. L(1758)88, L(1760)88, L(1761)88, L(1762)88, L(1764)88, L(1769)88 and L(1774), respectively.
The State has adjusted the host district incentive payments to six county districts (Brentwood, Webster Groves, Ritenour, Ladue, Kirkwood and Hazelwood) because these districts are accepting transfers in excess of 25%. The State believes its fiscal responsibility extends only to an attainment of individual Plan Ratios and any school district taking in transfers past their Plan Ratio and especially more than necessary to reach the 25% Plan Goal does so at its own financial risk. In its supplemental memo, the State expands upon the issue of fiscal responsibility for city-to-county transfers by reiterating its position that there is no legal obligation upon any county district to reach the 25% Plan Goal, and furthermore Liddell VII set a limit of 15,000 transfers. The State argues that the 15,000 figure approximates the number of transfers if all participating county districts reach their Plan Ratios, because if all participating county districts were obligated to reach Plan Goals (of 25%), there would be in excess of 19,000 transfers.
The county districts' collective position is two-fold. Firstly, they believe they should not be penalized for over-estimating the number of transfers needed at the start of the school year because it is virtually impossible to forecast attendance in order to maintain an absolute 25% (the State is willing to give a ½% leeway). The county districts' estimates try to account for the natural growth of the resident student population, the overall student population, and anticipated "withdrawals." Furthermore, the Settlement Agreement provides for adjustment of host district fiscal incentive payments for actual enrollment of transfers. Section X.B.1 calls for adjustments in January and June of each school year to reflect actual number of transfers attending in each county district. Discrepancies in payments are corrected at that time. Secondly, they argue that Liddell VII did set a limit of 15,000 city-to-county transfers, however, the county districts are still obligated under the Settlement Agreement to reach and maintain the 25% Plan Goal. Thus, the county districts conclude that they are obligated to accept transfers towards reaching the Plan Goal until the 15,000 transfer limit is met.
The City Board, the Caldwell-NAACP plaintiffs, and the Liddell plaintiffs argue that there is no 15,000 limit on transfers and that the Settlement Agreement obligates the county districts to continue accepting transfers in order to reach and maintain the 25% Plan Goal even if their individual Plan Ratios are met. They argue that the 15,000 figure referenced in Liddell VII simply reiterates the Settlement *238 Agreement's estimate of the number of transfers if all participating districts met their Plan Ratios. They further argue that the State's funding responsibility does not stem from the Settlement Agreement, but rather its liability as a constitutional violator. Thus, the State is fiscally responsible for interdistrict transfers even beyond the 25% Plan Goal. The City Board and both plaintiffs believe that the State's funding obligation only ends when the vestiges of segregation have been eliminated and a unitary system has been established.
The City of St. Louis believes that the Settlement Agreement obligates the county districts to accept transfers to reach and maintain the 25% Plan Goal, however, not more than 15,000 total transfer students. The City suggests that the State, City Board and the County Districts should work out an agreement regarding responsibility for cost of students in excess of 15,000.
In reaching its determinations, the Court has carefully reviewed the parties' arguments, Liddell VII and the Settlement Agreement. The issues raised by the State's motion place this Court in the difficult position of second-guessing the motives and reasoning behind the Liddell VII decision and the Settlement Agreement. This Court does not have the benefit of having been privy to the negotiations which resulted in the Settlement Agreement, nor does it possess the necessary skills to fathom the actual meaning of the language in Liddell VII. Thus, this Court will make its findings upon its interpretation of Liddell VII and the Settlement Agreement.
An examination of the plain language of the Settlement Agreement reveals several significant things. The Agreement in principle, which sets down the basis for the Settlement Agreement (Section I), clearly points out that the five basic elements of the Settlement Agreement are "at best statements of broad principles." One of these "broad principles" is the anticipated number of transfers by virtue of the Settlement Agreement. Section I.A.1.c. speaks of an estimate on the number of student transfers based upon 1980 Fall data reflecting declining enrollments. The 15,000 figure is specifically referred to as a "reasonable working figure". Nowhere in the Settlement Agreement is the 15,000 figure utilized as an absolute cap on the number of transfers. Instead, it is only an estimate of the number of transfers if all participating county districts were to reach their Plan Ratios. While it is true that Liddell VII makes reference to the 15,000 figure, there is nothing in Liddell VII to suggest that the Court of Appeals was setting a 15,000 ceiling on interdistrict transfers. It would appear from the total context of Liddell VII, that the Court of Appeals' statements were a reflection of its reading of the Settlement Agreement. The difference in interpretation of the Settlement Agreement by this Court to the Court of Appeals is debatable; however, it is not debatable that the appellate court affirmed the Settlement Agreement (with revisions not applicable here) as the guidelines by which the Interdistrict Plan operates. This Court finds that these guidelines do not set down a 15,000 limit on the number of transfers.
Another aspect of the Settlement Agreement pertains to Plan goals. This Court has already found that Section XII.D specifically requires each of the participating county districts, which has received final judgment for reaching its Plan Ratio to continue accepting transfer students in order to achieve and maintain the 25% Plan Goal. See, Order L(1631)87.
What remains in question is how long are the county districts obligated to accept transfers in striving for the Plan Goal, and the extent of the State's funding responsibility. The Settlement Agreement does not contain a termination date. What it does contain is a five-year stay of litigation. See Sections I.A.5 and XII. Section XII clearly establishes that the 5-year stay is a permissive delay in litigating the plaintiffs' (and City Board's) claims for 5 years. It is not a permanent relief from desegregation. It is an agreed-upon time period in which the county districts can attain certain litigation protection from the plaintiffs and the City Board; however, it does not *239 relieve the county districts from the continuing obligation to reach and maintain the 25% Plan Goal.
The State's funding obligation for interdistrict transfers is not based upon the Settlement Agreement, but rather upon the Court of Appeals finding that the State is a constitutional violator. Liddell VII, 731 F.2d 1294, 1297, 1302-03 and 1305-08. The Court of Appeals has consistently recognized the State's obligation to fund interdistrict transfers based upon its liability as a constitutional violator. Liddell III, 667 F.2d 643, 658, 659 (8th Cir.1981); Liddell V, 677 F.2d 626, 641-42, and Liddell VII, 731 F.2d at 1301-04. Furthermore, since interdistrict transfers are a "fundamental element" of a remedy fashioned to eradicate the remaining vestiges of school segregation in the metropolitan St. Louis area, it is clear that the State's obligation to fund the transfers does not end until the vestiges of segregation have been eliminated. Neither the Settlement Agreement nor any Liddell decisions provide that attainment of the Plan Goal by any or all of the participating county districts constitutes "eradication of the vestiges of segregation."
Thus, it is the Court's finding that, at this stage of the litigation, the county districts have continuing obligations to reach and maintain the Plan Goal, and the State has a continuing obligation to fund interdistrict transfers up to attainment and maintenance of Plan Goal. These obligations are not restricted in time or by a definite number of transfers. These obligations shall continue until the Court finds by law and fact that the vestiges of school segregation, in this case, have generally been eradicated.
The State has unilaterally chosen to adjust the initial fiscal incentive payments because the interdistrict transfers exceed the 25% Plan Goal. The State avers that six (6) districts are accepting in excess of 490 students. Since none of the county districts (especially the six offending districts) have objected to the State's numbers, the Court will accept the numbers reflected below as accurate:

 No. of Students Current No. of No. of Students
District for Plan Goal Transfer Students Exceeding Plan Goal
Hazelwood 346 443 97
Kirkwood 527 594 67
Ladue 332 385 53
Ritenour 582 815 233
Webster Groves 241 267 26
Brentwood 123 137 14
TOTALS 2.151 2,641 490

The State further suggests that this Court restrict the selection of school districts by transfer students. Presuming that a 15,000 maximum exists, the State feels that "excess" transfer students should be allocated first to Rockwood and Mehlville (only 2 districts not yet having attained Plan Ratio), then allocate to districts not yet reaching Plan Goal. In any event, the State maintains its fiscal obligations do not extend beyond attainment of Plan Ratio.
The Court of Appeals has repeatedly negated a similar suggestion by the State. Most recently, in Liddell XIV, 839 F.2d 400 (7th Cir.1988), the Court pointed out that the Settlement Agreement does not limit transfer students to those districts which have existing space to accommodate them, and reiterated its holding in Liddell VII that "complementary zones" would destroy the voluntariness aspect of the Interdistrict Plan. Liddell XIV, at 403. The State's present suggestion would also limit the voluntary nature of the Interdistrict Plan. This Court will not impose such a restriction.
Although the Court finds that the State is obligated to fund transfers necessary to attain the Plan Goal, it does not give carte blanche to the county districts to *240 abuse this financial obligation. The numbers presented by the State do not depict over-estimation by the six districts in question (although Ritenour's over-estimate is out-of-skew with the others). There is no allegation of intentional inflation of estimates of required transfer students. Rather, it appears to this Court that the County Districts are making their best educated guess of needed transfer students in September in light of variable factors such as resident black student population growth, overall student population and anticipated withdrawals. It would be virtually impossible for any of the county districts to precisely state the number of transfers it needs. In fact, the Settlement Agreement anticipated the impreciseness of such estimates. Section X.B.I provides for a correction of estimates in January and a final adjustment in June at which time discrepancies in payments can be corrected. If indeed the county districts are over-compensated, the State will get reimbursed after the June adjustment. There is nothing before the Court which indicates that this process has not been carried out in prior years or is no longer an acceptable method of financing.
The county districts need some leeway in their September estimates. However, as stated before, gross inflation of September estimates will not be tolerated. The county districts will be permitted to accept a reasonable number of transfers in excess of the 25% level. What is "reasonable" is difficult to state with exactness. However, the Court believes that the districts are capable of estimating within 10% the number of students needed to reach and/or maintain the Plan Goal. The County districts are expected to make their best effort at estimating their needs and shall not be penalized for a good faith effort in estimation. Even though the County districts will not be penalized for "reasonable over-estimation" they also will not be allowed to profit by it. The State is only fiscally responsible for the number of transfer students accepted by the districts in order to reach and/or maintain Plan Goal, plus a 10% leeway. Additional students are the county districts' fiscal responsibility.
The State violated the terms of the Settlement Agreement by deliberately sidestepping Section X and withholding funds. Funding to these six districts must be reinstituted according to the January adjustments, allowing for 25% Plan Goal and the 10% leeway. If the January adjustments have been delayed by the State's motion, then such adjustments are to be made immediately and funding restored. The State shall continue funding interdistrict transfers in accordance with the terms of the Settlement Agreement, and this Order.
Finally, the Court wishes to emphasize that this Order and Memorandum are to be construed narrowly, i.e. applicable only with regard to the issues of host district incentive payments and the legal obligations (under the Settlement Agreement) of the participating county districts to reach and maintain Plan Goals (of 25%). This is not a determination by the District Court as to the time span of the Settlement Agreement or any other desegregation program presently operating in St. Louis. The requirements and the consequences of "finality" of any of the St. Louis desegregation plans and the legal determination of what facts constitute a general eradication of the vestiges of school segregation in this case, are yet to be addressed by this or any court.

ORDER
In accordance with the memorandum filed herein today,
IT IS HEREBY ORDERED that the State's motion for clarification, L(1715)87, be and is DENIED and that the State shall tender the withheld funds in accordance with the accompanying memorandum.