UNITED STATES of America, Plaintiff–Appellee,

v.

BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant–Appellee.

Chicago School Finance Authority, Intervenor–Appellant.

No. 93–3582.

United States Court of Appeals, Seventh Circuit.

Submitted Nov. 8, 1993.

Decided Nov. 10, 1993.

Opinion Dec. 9, 1993.

Michele M. Fox, Asst. U.S. Atty., Chicago, IL, William B. Reynolds, Michael H. Sussman, Dept. of Justice, Civil Rights Div., Appellate Section, William Kanter, Neil H. Koslowe, Dept. of Justice, Civil Div., Appellate Section, Washington, DC, David George Lub-

ben, U.S. Dept. of Justice, Chicago, IL, Alexander C. Ross, U.S. Dept. of Justice, Civil/Appellate Div., Washington, DC, for U.S.

James G. Bradtke, Kathleen Mangold–Spoto, Robert C. Howard, Futterman & Howard, Chicago, IL, for defendant-appellee.

· ˙ Roger Pascal, Joseph R. ˙Lundy, Deborah A. Golden, Schiff, Hardin & Waite, Chicago, IL, for intervenor-appellant.

Before POSNER, Chief Judge, and BAUER and CUDAHY, Circuit Judges.

POSNER, Chief Judge.

The Chicago School Finance Authority has appealed from a purported temporary restraining order blocking enforcement of an Illinois law that prohibits the Board of Education of the City of Chicago from making expenditures (other than for debt service) except in conformity with a budget approved by the finance authority. The law forbids the finance authority to approve a budget that is not balanced, and the school board has not submitted a balanced budget; so were it not for the restraining order, it could not have operated the schools and they would have had to close. Because the restraining order was due to expire on November 15 and a hearing in the district court was scheduled for that day, this court considered the appeal on an expedited basis. The last brief was filed on November 8, and we issued our order vacating the temporary restraining order on November 10 with a notation that an opinion would follow. Judge Cudahy dissented, stating that he would uphold the temporary restraining order for the reasons the district judge had given in issuing it.

At the request of the school board we stayed our order until midnight on Friday, November 12, to permit an orderly shutdown of the schools. On Sunday, November 14, however, the Illinois legislature passed and the governor signed a law resolving the political impasse by (among other things) suspending the balanced-budget requirement and lifting the statutory cap on the issuance of school bonds. So classes resumed as usual on Monday.

Thirteen years ago, in 1980, the school board resolved a discrimination suit that the United States had brought against it by entering into a consent decree in which it agreed to take certain steps to remedy the lingering effects of past racial and ethnic segregation in the Chicago public schools. The decree (amended in 1987) contains provisions concerning magnet schools, student transfers, remedial education, and other methods for promoting integrated schooling and, where that is infeasible, for providing compensatory education for disadvantaged black and Hispanic students. When the decree was issued, the vast majority of students in the Chicago public schools were black or Hispanic. The same is true today. Disputes relating to the decree have been brought to this court several times before. See *United States v. Board of Education,* 799 F.2d 281, 283–84 (7th Cir.1986), and cases cited there.

Also in 1980, the State of Illinois enacted the School Finance Authority Act, 105 ILCS 5/34A–101 *et seq.,* which created the Chicago School Finance Authority to issue school bonds and monitor the school board's finances. If the finance authority does not approve the school board's budget—and it cannot lawfully approve a budget that is not balanced—the board cannot spend any money and the schools must close. With the 1993–1994 school year about to start and the school board unable to come up with a balanced budget, the Illinois legislature suspended the Act's balanced-budget requirement from September 1 to 12, 1993, but with conditions that caused the school board to decide not to open the schools. The day after the suspension expired, the school board asked for and obtained the temporary restraining order from the district court, and the schools finally opened.

The board wanted the district court, which has jurisdiction to enforce, modify, or rescind the consent decree, to authorize the board to spend in violation of state law. The board had cash that would enable it to keep operating, for a while anyway; and for the longer term it wanted the court to lift the cap on the finance authority's borrowing powers. The ground for the relief sought was that if the schools are closed, the objectives of the consent decree cannot be achieved. As nothing in the consent decree requires the schools to

operate if they lack the funds to do so, it may appear that the school board was asking the district court to modify the consent decree to make it more stringent. This would mean, since the board is the defendant in the underlying discrimination suit in which the consent decree was issued, that the board was in effect suing itself. Such a suit would obviously lack the adverseness that is a precondition to the exercise of federal jurisdiction under Article III of the Constitution.

■ But self-suing would not be a realistic interpretation of what the board was trying to do. The board was seeking not to tie its own hands but to free itself from the constraints of state law. Concretely it was trying to get the district judge to enjoin a nonparty to the consent decree, the Chicago School Finance Authority, from exercising its statutory control over the board's finances. The district judge was therefore right to permit the finance authority (which is expressly authorized to sue and be sued, 105 ILCS 5/34A–201(a)) to intervene in opposition to the school board's request. The finance authority is the real defendant, and the school board the real plaintiff, in what amounts to a proceeding to supplement or modify the consent decree, or perhaps to obtain entirely new relief unrelated to the decree. The United States, the board's nominal adversary in the discrimination suit, did not appear at the initial hearing on the board's request for relief and has in fact played virtually no role in the proceedings on that request. Although it might seem that the Illinois attorney general would be the proper defender of a state statute (the School Finance Authority Act, which the school board was asking the district court to suspend), neither he nor the state were named as defendants. There cannot be any doubt, however, about the authority of the finance authority to defend the Act without the participation of the state attorney general. We know this because when a constitutional challenge was brought against the Act, it was defended by private counsel hired by the finance authority; there was no participation by the attorney general. *Polich v. Chicago School Finance Authority,* 79 Ill.2d 188, 37 Ill.Dec. 357, 402 N.E.2d 247 (1980). And later the finance authority, again represented

by private counsel and again without participation by the attorney general, was permitted to seek mandamus against the Chicago City Council to assure that there would be sufficient revenues to repay the bonds that the authority had issued. *Chicago School Finance Authority v. City Council,* 104 Ill.2d 437, 84 Ill.Dec. 668, 472 N.E.2d 805 (1984). That is essentially what it is seeking in the present case: assurance that the school board has net revenues before debt service sufficient to pay interest on and eventually repay the principal of the bonds.

Of course the finance authority should not have been compelled to intervene in order to bring its defenses before the district court; the school board should have named it as the defendant in its request for relief. The failure to do so left initially unclear whom the temporary restraining order was intended to restrain.

■ With the parties realigned to reflect the actual dispute, it is apparent that there is that real, concrete adversity required by Article III to ground federal jurisdiction. The finance authority in its role as issuer of school bonds will be harmed if the school board is allowed to keep spending even though its budget is not balanced. For it is the authority—not the city, not the state, and not the school board—that is the obligor on the bonds. 105 ILCS 5/34A–603. That is why the finance authority refused to approve the board's budget, which showed a shortfall of $270 million. A continued deficit may make it impossible for the finance authority to repay the present bondholders. That is why the finance authority is permitted to and does hire private counsel to defend its, which is to say the bondholders', financial interests.

■ The temporary restraining order, which had been issued on September 13, was extended with the finance authority's consent until October 15. On that day the judge, in violation of Fed.R.Civ.P. 65(b), extended the order through November 15 over the finance authority's objection. Rule 65(b) provides that a temporary restraining order cannot remain in effect for more than 20 days without the consent of the parties. *Geneva Assurance Syndicate, Inc. v. Medical Emergen-*

*cy Services Associates,* 964 F.2d 599 (7th Cir.1992) (per curiam). When it is extended further, it becomes a preliminary injunction, immediately appealable to this court under 28 U.S.C. § 1292(a)(1). *Sampson v. Murray,* 415 U.S. 61, 86, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1392 (7th Cir.1992); *Quinn v. Missouri,* 839 F.2d 425 (8th Cir. 1988) (per curiam).

█ Another provision of the rule, Rule 65(d), requires that a temporary restraining order or an injunction describe in reasonable detail the acts sought to be restrained. The order appealed in this case does not even say *who* is restrained, cf. *Schmidt v. Lessard,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) (per curiam), and in fact there was no defendant when the school board first asked for the order, though at some point it became clear that the finance authority was enjoined, so we cannot say that the order was so vague as to make it unenforceable by contempt or other sanction and therefore (because not binding) unappealable. See *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 276 (7th Cir.1992).

In disregarding the limits that Rule 65(b) places on the duration of temporary restraining orders, the judge hoped to foster a political solution to what is, after all, a political dispute. As he explained in his order of October 15, he was concerned that holding an evidentiary hearing, as he would have had to do in order to issue a valid preliminary injunction in the circumstances of this case, would interfere with the resolution of the budgetary impasse by the executive and legislative branches of the state. He said, "I don't want any energies diverted from the main task at hand, and this is to try and seek a legislative solution not affected by anything I have done here." Even if this were a correct assessment of the possible impact of a hearing on the political process, it would not justify the violation of a federal rule intended for the protection of the basic procedural rights of persons sought to be prohibited from performing what they conceive to be their legal obligations. In the event, the only effect of the district court's action in bypassing lawful procedure was that the impasse remained unresolved when the Illinois legislature recessed on November 4.

█ Whether the district judge abused his discretion in entering the preliminary injunction is a question that almost answers itself. Since there was no evidentiary hearing, no facts were developed bearing on the balance of irreparable harms or on the likelihood of the school board's prevailing on its request to enjoin the operation of an Illinois statute administered by an agency that is not a party to the consent decree on which the request is based and has never, so far as the record discloses, been accused of, let alone been found to have engaged in, racial or ethnic discrimination. That the public-school children of Chicago would be harmed, probably severely and possibly irreparably, by a protracted school closing that might—or might not—ensue from the denial of the relief sought by the school board was, without the illumination of the issue by an evidentiary hearing, no more than plausible. For without out a budget approved by the finance authority the schools would run out of cash soon and have to close no matter what the district court did. The finance authority was never granted a hearing to explore the possibly severe and conceivably irreparable harm to the objectives of the School Finance Authority Act if the school board is permitted to go on making expenditures in excess of its revenues until it goes broke.

Even if the balance of irreparable harms had inclined sharply in favor of the grant of the preliminary injunction, the grant would have been impermissible because the moving party (the school board) failed to demonstrate even a faint chance of success on the merits. *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993). The dispute between the school board and the finance authority is entirely a matter of state and local law and politics. There is no federal issue.

█ A consent decree entered by a federal court, like any other injunction, can have adverse consequences on third parties without thereby being rendered invalid. But it is not a proper vehicle for extinguishing the

legal rights and duties of third parties. *People Who Care v. Rockford Board of Education,* 961 F.2d 1335, 1337 (7th Cir.1992); *Dunn v. Carey,* 808 F.2d 555, 560 (7th Cir. 1986). The consent decree between the United States and the school board could not lawfully have extinguished the right and duty conferred on the finance authority by the School Finance Authority Act to control the school board's finances. A consent decree is not to be used as a device by which A and B, the parties to the decree, can (just because a judge is willing to give the parties' deal a judicial imprimatur) take away the legal rights of C, a nonparty. Anyway the consent decree did not purport to do any such thing. The decree does not mention the finance authority or regulate the financing of the Chicago public schools. It does contain provisions requiring the schools to devote resources to the remedial and other measures directed by the decree, but it is a porous requirement, as it can be relaxed in extraordinary circumstances—an exact description of what happened when the board found itself unable to submit a budget that the finance authority could lawfully approve. More important, the decree assumes rather than requires that the schools have resources sufficient to enable them to operate. The decree does not purport to assure that the schools *will* have those resources. Had such assurance been desired, the decree would have been worded differently and, more important, it would have named additional parties as defendants, since the Chicago public-school system is not self-financing.

■ If the finance authority had refused to approve the school board's budget for racially discriminatory reasons, it would be in violation of federal law regardless of the consent decree; and we may assume without having to decide that in such a case, rather than institute a whole new lawsuit against the finance authority, the United States, as the plaintiff in the suit in which the consent decree was entered, could have asked the district judge to order relief against the finance authority in the proceeding itself. It did not do so. If the finance authority, having (as it does) "actual notice" of the decree, were in "active concert" with the board in violating it—if it were in effect an aider and abettor of a violation of the decree by a named party—it would be bound by the decree directly though not named in it. Fed. R.Civ.P. 65(d), 71; *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832 (2d Cir.1930) (L. Hand, J.); *Stotler & Co. v. Able,* 870 F.2d 1158, 1164 (7th Cir.1989). There is even authority that anyone who takes steps deliberately to thwart the enforcement of a judicial decree can be hauled into court and dealt with summarily even though he is not named in the decree or acting in concert with someone that is, or violating any source of legal obligations other than the decree itself. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078 n. 32, 61 L.Ed.2d 823 (1979); *Herrlein v. Kanakis,* 526 F.2d 252, 255 (7th Cir.1975); *United States v. Hall,* 472 F.2d 261 (5th Cir.1972). None of these principles is applicable here. All the finance authority has done is to comply with a state law neither alleged to be vulnerable to challenge under the equal protection clause nor prohibited or even mentioned by the consent decree.

We may further assume that if not the finance authority but the state itself, perhaps through its legislature, were guilty of racial discrimination, the finance authority could not hide behind a state law that prevented it from approving the expenditure of funds necessary for the administration of the remedial and other resource-consuming features of the consent decree. The case would then be analogous to (though not so strong as) *Missouri v. Jenkins,* 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990). There both a school district and the state itself were found to have engaged in racial discrimination. The district court entered a desegregation order and calculated that it would cost the school district tens of millions of dollars to comply with the order. A state law limiting the taxing authority of local government prevented the school district from levying sufficient taxes to defray the cost of compliance. The Supreme Court held that the school district was not bound by the statutory limitation. Of course not. The state—the violator, the joint tortfeasor—could not disable its accomplice from compliance with the remedial de-

cree. There is nothing like that here. It is not contended that the finance authority, the Illinois legislature, or anyone else connected with the enactment and administration of the School Finance Authority Act is violating federal law. The only even arguable violator of federal law is the school board, although even it did not concede liability in the consent decree. Since most Chicago public-school children are black or Hispanic, the closing of the public schools, an event to which the finance authority and the state legislature have contributed, would have a disproportionate impact on minorities; but only intentional discrimination violates the equal protection clause. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

█ The school board is reduced to arguing the following syllogism in defense of the district court's action: the consent decree requires it to spend money on remedial and other measures related to integration; the finance act is preventing it from spending that money; therefore the finance act violates the decree. We need not go beyond the first premise. It is false. The decree requires the school board to devote certain resources to certain programs, assuming of course that the schools are open. It does not require the schools to be open. It does not prescribe the length of the school year. It has no provisions for times when the schools are in recess or closed because of strikes or bad weather. The decree assumes that the schools will operate more or less as usual, be open for more or less the usual time, but if the drafters had wanted to make the assumption a legal obligation—had wanted to ensure that the objectives of the decree would not be circumvented by some financial disaster that might cause the schools to close for a longer or shorter time during the regular school year—they would not have written the decree the way they did or confined its coercive provisions to a body, the school board, that does not control its own finances.

If the school board is at fault, it can be punished or enjoined; but a faultless third party cannot be. We have emphasized that if the finance authority or the Illinois legislature were motivated by discriminatory intent or hostility to the consent decree in preventing the schools from opening despite the lack of a balanced budget, the plaintiffs would be entitled to the type of injunctive relief that they sought. But that is not argued. The state is still not a party to the suit; and the finance authority is no more culpable than if the schools had been closed by a fire or a flood. In a previous opinion dealing with this consent decree, a different panel of this court observed that the decree may not be "capable of assuring the school children of Chicago the rights they allegedly are being deprived of." *United States v. Board of Education, supra*, 799 F.2d at 298. If that is the problem, proceedings to enforce the decree against innocent third parties are not the solution.

The injunction is vacated with instructions to dismiss the school board's request for relief.

BAUER, Circuit Judge, concurring in the opinion and judgment of the court.

I yield to no one in my admiration for Judge Kocoras. And to the extent the dissent praises the motives of Judge Kocoras, I join it. On the other hand, simply to say that he sought to protect the children of Chicago is not enough to confer jurisdiction on his or any other federal court on the issues raised in this appeal.

Nor do I think that this court can assume jurisdiction by a reflection, however accurate or noble, on the history of the Civil War and its aftermath or on speculation that had the majority of the children involved been white the issue would have been settled long since. As the dissent states, not one word of racial animus was introduced in this case until that suggestion was penned. Indeed "Judges are not Kings." Nor can we create jurisdiction where none exists.

Judge Kocoras acted, I am sure, with what he believed to be legally appropriate orders. And in so doing, he acted in the "finest tradition of the federal judiciary." It is worthy of note that as long as the restraining order remained in effect, no solution seemed possible. Two days after it was dissolved, the state agencies solved the problem.

I believe this panel also acted in the finest tradition of the federal judiciary: ruling on the case before it in what the majority considers to be the law on the issues.

CUDAHY, Circuit Judge, dissenting.

It is easily forgotten that, when Judge Kocoras entered the temporary restraining order, there was no prospect of any other agency or circumstance's opening the doors of Chicago's public schools. In fact, a new contract still had to be negotiated between the Teachers Union and the School Board. This turned out to be a difficult, laborious and time-consuming task, carried out in the shelter of Judge Kocoras' decree. It may be easy in hindsight to find fault with the finer points of Judge Kocoras' analysis or to scorn the link between the desegregation decree and the ability of the schools to operate. But I think Judge Kocoras acted in the finest tradition of the federal judiciary as, in effect, the agency of last resort in coming to the aid of the overwhelmingly minority public school population. At the time they were taken, Judge Kocoras' actions were consented to and supported by all the actors involved in the controversy, including the Attorney General of Illinois, who is charged with enforcement of the school finance law.

There has been no finding to the effect, nor am I aware, that there was racial animus in any aspect of this school crisis. But it is a good bet that, if Chicago's public school students were predominantly white, the financial crisis would never have reached a point requiring the intervention of the federal courts.

The majority opinion vacates the injunction ordered by Judge Kocoras because boarding up all of Chicago's public schools raises "no federal issue." Maj. op. at 672. In the majority's view, the "dispute between the school board and the finance authority is entirely a matter of state and local law and politics." *Id.*

Where there truly is no federal issue involved, federal courts should stay out of local politics. As is often the case, the federal court here stepped in after the political actors all but abdicated their responsibilities. Justice Ruth Bader Ginsburg, for example,

has written that the "need for interventionist decisions" by judges "would be reduced significantly if elected officials shouldered their responsibility" for decisionmaking. Ruth Bader Ginsburg, *Inviting Judicial Activism: A Liberal or Conservative Technique,* 15 Ga. L.Rev. 539, 550 (1981). She thus notes that the involvement of the federal courts in announcing a full-blown constitutionalized abortion right may have unduly interfered with a political process that might have otherwise worked out the solution to its own problems. Leaving the matter to the political actors "might have served to reduce rather than to fuel controversy." Ruth Bader Ginsburg, *Speaking in a Judicial Voice,* 67 N.Y.U.L.Rev. 1185, 1199 (1992).

As it turns out, the same proposition appears to be true here. Once the band-aid of federal court intervention was torn off, the political branches of government were forced to deal with their problems, to cleanse their wounds. Perhaps it is correct that, in order to preserve political capital and to allow local actors to solve their own problems, federal courts should be unobtrusive, *see* Richard A. Posner, *The Federal Courts: Crisis and Reform* ch. 7 (1985). But a court is clearly not permitted, waving this policy preference as a wand, to make a federal interest disappear.

Faced with the prospect of shuttered schools, Judge Kocoras, who is charged with overseeing the Consent Decree entered into between the Board of Education and the Justice Department, concluded that closing the schools would deny minority students access to the special remedial programs established under the Consent Decree. These programs were established as a remedy for the fact that for decades Chicago's public schools were, in effect, segregated, denying the city's schoolchildren their right to equal protection under law. *See* Consent Decree, *United States v. Board of Educ. of the City of Chicago* (N.D.Ill. Sept. 24, 1980), App. 387.

In Judge Kocoras' view, the maintenance of these programs was inextricably tied in with the core function of the schools. Closing the schools and therefore shutting down these programs would violate federal law. Today's majority reverses Judge Kocoras,

insisting that none of this raises any question of federal law. Since the Civil War and Reconstruction there has been very broad agreement that the federal courts have a central role in enforcing constitutional guarantees against state and local governments, especially the guarantee of equal protection of the law. *See* Robert J. Kaczorowski, *The Politics of Judicial Interpretation: The Federal Courts, The Department of Justice and Civil Rights, 1866–1876* (1985).

The consent decree entered in *United States v. Board of Educ. of the City of Chicago* is exactly such an effort. In order to guarantee that Chicago's public school students—most of whom are black or Hispanic—receive the equal protection of the law to which the Fourteenth Amendment entitles them, the Chicago Board of Education agreed, after being sued by the Justice Department, to take affirmative steps to eradicate the persistent vestiges of past racial and ethnic segregation. These steps included running magnet schools, remedial programs and compensatory education.

Judge Kocoras concluded that closing the schools would interfere with the operation of these programs, which are "inextricably bound up" with the "core educational program." App. 283. But the majority says that Judge Kocoras misunderstood the consent decree. According to the court, the consent decree assumes rather than requires the existence of schools in the first place. Padlocking the schools altogether, while inconsistent with the assumptions underlying the consent decree, does not violate its terms. The majority in effect finds that the consent decree contains an implicit term, telling the School Board that it does not need to do any of the things that the decree requires, so long as its reason for failing to comply does not in itself amount to an independent violation of the Equal Protection Clause. Maj. op. at 672–74.

This is inconsistent with the supremacy of federal law. Once a federal court orders that an action be taken to give effect to a constitutional right—and a city's obligation to operate desegregated schools is as good an example as any—the failure to do so empowers the federal court to issue an injunction. If a 1950s–style segregated school system were ordered to desegregate, and it refused, balked or stalled, it would make no difference whether the school's actions were driven by racial animus or a bona fide fiscal crisis.

The majority does have a point in suggesting that the relationship between the 13–year–old consent decree and Judge Kocoras' injunction is an attenuated one. Perhaps it is too attenuated to support the exercise of federal authority over the machinations of state and local political processes. But because the court thought that the threatened injury to the city's minority schoolchildren was irreparable, it needed to find only that they had a greater than negligible chance of succeeding on the merits. *See Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 387 (7th Cir.1984); Developments in the Law, *Injunctions,* 78 Harv.L.Rev. 994, 1056 (1965) ("Clear evidence of irreparable injury should result in a less stringent requirement of certainty of victory.").

This is a matter of judgment. The conclusion is not entirely obvious, and there is in my view at least a plausible argument to be made on Judge Kocoras' side. Perhaps, if I were deciding this case in the first instance, I would conclude that the majority had the better of the argument. But that is a legal fine point. And if this case is to be governed by legal fine points, there may be in my view another dispositive issue—the absence of appellate jurisdiction.

The primary source of the federal courts of appeals' jurisdiction is 28 U.S.C. § 1291, granting the courts of appeals the power to review final judgments entered by federal district courts. One of the statutory exceptions to the final judgment rule allows appellate courts to hear appeals from the entry of preliminary injunctions. 28 U.S.C. § 1292(a)(1). Appeals courts do not have jurisdiction, however, to review a district court's decision to enter a temporary restraining order. *See Weintraub v. Hanrahan,* 435 F.2d 461 (7th Cir.1970).

From September 13 until October 3, Judge Kocoras' order was undoubtedly a non-appealable temporary restraining order. And so it remains, under Rule 65(b), if the party

against whom it is directed consented to the extension. *Ross v. Evans,* 325 F.2d 160 (5th Cir.1963). *See also* Maj. op. at 671; *Samson v. Murray,* 415 U.S. 61, 86–87, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974).

This order enjoined the enforcement of Illinois state law, permitting the School Board to spend money already in its coffers, state law to the contrary notwithstanding. *See* App. at 285. It is thus the state against whom the district court's order is directed. Here, the Attorney General (the only official under Illinois law empowered to represent the state and defend its laws, *see Risser v. Thompson,* 930 F.2d 549 (7th Cir.1991)) consented to the extension of the temporary restraining order. The state is enjoined from enforcing its law, and the state (which is therefore the real party in interest, even if not a "named" defendant) consents. App. 21.

The only "party" who did not consent to the extension of the temporary restraining order is the School Finance Authority. The question is therefore whether (as the majority clearly believes) the Finance Authority is a party against which the injunction is directed for the purposes of Rule 65(b). Under Illinois law, the Finance Authority's enforcement authority is unclear. While there is some boiler-plate language giving it all necessary power to carry out its purposes, 105 ILCS § 5/34A–201, state law grants it only one specific enforcement power of any consequence in this context. Where the Finance Authority believes that the School Board is spending in violation of the balanced budget law, it is permitted to make a written finding that it can report to the "authority" charged by state law with enforcing any "penalty or liability." 105 ILCS § 5/34A–201a. Illinois state law makes clear that this "authority" is the state's Attorney General. Ill. Const., Art. V, § 15; 15 ILCS § 205/4. But here, the Attorney General consented to the extension of the temporary restraining order.

The temporary restraining order permitted the Board of Education to spend money that it already had, in violation of state law. Had the Board of Education done exactly that in the absence of the temporary restraining order, the only thing the Finance Authority could have done about it, under state law, was report its findings to the Attorney General. And the Finance Authority was not prevented, by virtue of this temporary restraining order, from doing that. Thus, because the temporary restraining order did not prevent the Finance Authority from doing anything that it was otherwise empowered to do under state law, it is not a party against which the court's order was directed. That is the central inquiry, and it is not affected by the fact that the Finance Authority has the general power to sue and be sued (when, for example, it enters into a contract) or by the fact that it has standing to defend the constitutionality of the Act (which implicates the very existence—not merely the enforcement powers—of the Authority).[1] The temporary restraining order therefore remains a temporary restraining order (rather than a preliminary injunction), and we lack appellate jurisdiction.

While this may be a legal fine point, I see no reason for this court to leap over one legal fine point simply to seize upon another. Judge Kocoras advanced defensible reasons for having the federal courts intervene in this case. Judges are not Kings. They have no plenary power simply to do what they think right. But neither are they robots. The law is a humanistic, not merely a scientific, discipline. *See* Martha C. Nussbaum, *The Use and Abuse of Philosophy in Legal Education,* 45 Stan.L.Rev. 1627, 1629 (1993); *see generally* Martha Nussbaum, *Love's Knowledge* (1990). In this case there was a plausible legal argument, and a compelling human one, for Judge Kocoras' actions. The majority today rejects his legal conclusions. While I might in some quite different context be persuaded to agree, I am not here, for the

---

1. Nor is the fact that the Finance Authority has in the past hired private counsel and sought a writ of mandamus persuasive on this point. None of the instances cited by the majority involves a situation where the Finance Authority has taken a position inconsistent with or con-

trary to the Attorney General's litigating posture. I doubt that the Finance Authority is nonetheless empowered independently to enforce the state law in the face of the limitations provided by that law. *See* 105 ILCS § 5/34A–201a.

reasons given, even certain of our jurisdiction. I therefore respectfully dissent.