PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHRISTOPHER BACON; D.B., the infant
who sues by and through his mother
and next friend Vicki Beatty; VICKI
BEATTY; CITIZENS FOR FULL
ACCESS IN RICHMOND,
           *Plaintiffs-Appellees,*

v.

CITY OF RICHMOND, VIRGINIA; L.
DOUGLAS WILDER, JR., in his official
capacity as Mayor of Richmond,
Virginia; CITY COUNCIL OF
RICHMOND, VIRGINIA,
           *Defendants-Appellants,*

SCHOOL BOARD OF THE CITY OF
RICHMOND, VIRGINIA,
           *Defendant-Amicus Curiae.*

No. 06-1347

VIRGINIA MUNICIPAL LEAGUE; LOCAL
GOVERNMENT ATTORNEYS OF
VIRGINIA, INCORPORATED,
           *Amici Supporting Appellants,*

VIRGINIA OFFICE FOR PROTECTION AND
ADVOCACY, Commonwealth of
Virginia; PARALYZED VETERANS OF
AMERICA,
           *Amici Supporting Appellees.*

CHRISTOPHER BACON; D.B., the infant
who sues by and through his mother
and next friend Vicki Beatty; VICKI
BEATTY; CITIZENS FOR FULL
ACCESS IN RICHMOND,
                    *Plaintiffs-Appellants,*

                    v.

CITY OF RICHMOND, VIRGINIA; L.
DOUGLAS WILDER, JR., in his official
capacity as Mayor of Richmond,
Virginia; CITY COUNCIL OF
RICHMOND, VIRGINIA,
                    *Defendants-Appellees,*

SCHOOL BOARD OF THE CITY OF
RICHMOND, VIRGINIA,
                    *Defendant-Amicus Curiae.*

VIRGINIA OFFICE FOR PROTECTION AND
ADVOCACY, Commonwealth of
Virginia; PARALYZED VETERANS OF
AMERICA,
                    *Amici Supporting Appellants,*

VIRGINIA MUNICIPAL LEAGUE; LOCAL
GOVERNMENT ATTORNEYS OF
VIRGINIA, INCORPORATED,
                    *Amici Supporting Appellees.*

No. 06-1594

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(3:05-cv-00425-HEH)

Argued: November 29, 2006

Decided: January 23, 2007

Before WILKINSON and DUNCAN, Circuit Judges, and Joseph R. GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.

---

Reversed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Goodwin joined.

---

## COUNSEL

**ARGUED:** David J. Freedman, Assistant City Attorney, CITY ATTORNEY'S OFFICE FOR THE CITY OF RICHMOND, Richmond, Virginia, for Appellants/Cross-Appellees. Joseph J. Mueller, WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P., Boston, Massachusetts, for Appellees/Cross-Appellants. **ON BRIEF:** Beverly Agee Burton, Senior Assistant City Attorney, CITY ATTORNEY'S OFFICE FOR THE CITY OF RICHMOND, Richmond, Virginia, for Appellants/Cross-Appellees. David D. Hopper, COOK, HEYWARD, LEE, HOPPER & FEEHAN, P.C., Richmond, Virginia; Cynthia D. Vreeland, WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P., Boston, Massachusetts; Christopher Davies, WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P., Washington, D.C., for Appellees/Cross-Appellants. William D. Bayliss, Edward J. Dillon, WILLIAMS MULLEN, P.C., Richmond, Virginia, for Amicus Curiae School Board of the City of Richmond, Virginia. William S. Mailander, Michael P. Horan, PARALYZED VETERANS OF AMERICA, Washington, D.C., for Amicus Curiae Paralyzed Veterans of America. Julie C. Kegley, Steven M. Traubert, COMMONWEALTH OF VIRGINIA, Virginia Office for Protection and Advocacy, Richmond, Virginia, for Amicus Curiae The Commonwealth of Virginia, Virginia Office for Protection and Advocacy. L. Lee Byrd, Sharon E. Pandak, Jeffrey H. Geiger, SANDS, ANDERSON, MARKS & MILLER, P.C., for Amici Curiae Virginia Municipal League and Local Government Attorneys of Virginia, Inc.

**OPINION**

WILKINSON, Circuit Judge:

In this case we are asked to decide whether a city may be required to fund a federal court order mandating the system-wide retrofitting of city schools, under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34 (2000), without any determination that the city discriminated against or otherwise excluded plaintiffs from its services and activities. Recognizing the fundamental precept that remedies may be imposed only upon a party judged liable for some harm, we reverse the judgment of the district court. To impose a funding obligation on the city in the absence of any underlying finding of liability would disrespect the long-standing structure of local government and impair the Commonwealth's ability to structure its state institutions and run its schools.

I.

This case arises out of a settlement agreement in which the Richmond City School Board agreed to retrofit fifty-six of its sixty school buildings and to make approximately $23 million in capital improvements over five years. Plaintiffs, primarily disabled school children and their families, seek equal access to Richmond school buildings and to the services, programs, and activities conducted therein. They sued the Richmond City School Board as well as the City of Richmond, the Richmond City Council, and the Mayor of Richmond under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34 (2000), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (2000), and the Virginians with Disabilities Act, Va. Code Ann. § 51.5-1 et seq. (2005). Plaintiffs alleged that fifty-six of Richmond's sixty public schools violated the ADA's structural accessibility guidelines and requested system-wide injunctive relief.

The schools at issue here were constructed prior to 1992, the year that the ADA became effective. In 1992, the School Board commissioned an architectural study to evaluate structural compliance with the ADA. This study revealed accessibility barriers and recommended a series of retrofitting projects designed to bring pre-1992 buildings into compliance with Title II. The school system made various

improvements to Richmond Public School buildings but did not fully implement the 1992 study.

In 2004, the School Board commissioned Trice Architects to conduct a second ADA compliance study. In its January 2005 report, Trice Architects identified a variety of barriers to access, including a lack of wheelchair ramps, elevators, handrails, and wheelchair-accessible bathrooms. After receiving the study, the School Board formed an ADA Subcommittee that developed a three-year remediation plan and called for ADA-related capital improvements beginning in the 2005-06 school year.

On May 31, 2005, the City Council adopted its 2006 capital improvements budget. That budget allocated $2 million in capital improvement funds to the Richmond Public Schools for fiscal year 2006 and $21.6 million over the next five years. Plaintiffs filed suit on June 14, 2005. They argued that the budget provided almost no funding to correct the school's disability accommodation deficiencies. For its part, the City contended that the School Board failed to bring the ADA noncompliance to its attention in a timely fashion and also that the School Board had surplus capital funds sufficient to fund the first year of ADA remediation.

After the district court denied defendants' motions to dismiss plaintiffs' ADA and Rehabilitation Act claims, *Bacon v. City of Richmond*, 386 F. Supp. 2d 700, 706-08 (E.D. Va. 2005), the School Board settled with plaintiffs. The School Board first conceded that the Richmond Public Schools did not comply with federal and state disability laws. It then agreed with plaintiffs that the appropriate remedy was to "bring the Richmond Public Schools into compliance with the Disability Laws" by executing the remediation plan proposed by the ADA Subcommittee within five years. The School Board also agreed to pay $45,000 in attorneys' fees and costs and to "use its best efforts to obtain the funding necessary to fully implement [the Settlement] Agreement." The Settlement Agreement, however, provided that the School Board's obligations were "contingent on" the School Board "receiving funding from the City of Richmond."

The City and plaintiffs then filed cross-motions for summary judgment. The City contended that, because Virginia law vests the School

Board with exclusive control over City schools, it was not responsible for the ADA violations. Plaintiffs maintained that since the City provided capital funding to the Richmond schools it was critical to the Settlement Agreement and thus a necessary party. The district court agreed with plaintiffs. It granted summary judgment in their favor and ordered the City to "ensure that the Richmond City Public Schools become ADA-compliant" within five years. *Bacon v. City of Richmond*, 419 F. Supp. 2d 849, 855 (E.D. Va. 2006) [hereinafter *Bacon II*]. In this connection, the district court imposed upon the City a funding obligation, directing the City to make "a reasonable, good faith appropriation to the School Board in the normal course of the budget process, sufficient to enable ADA compliance within the specified time frame." *Id.* The district court denied plaintiffs' subsequent petition for attorneys' fees. Both parties now appeal.

We review the district court's grant of summary judgment *de novo* resolving all doubts and inferences in favor of the non-moving party. *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 354 (4th Cir. 2003). When faced with cross-motions for summary judgment, we consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations omitted). Although decisions relating to injunctive relief are normally reviewed for abuse of discretion, the court's review is *de novo* where the disputed issue is a question of law. *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 116 (4th Cir. 1993) (quoting *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986)).

## II.

Our legal system is built on the foundational principle that remedies are a means of redressing wrongs. As the Supreme Court has long made clear, a remedy must be tailored to a violation. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971). "As with any equity case, the nature of the violation determines the scope of the remedy." *Id.* Remedies, in other words, do not exist in the abstract; rather, they flow from and are the consequence of some wrong. At its most basic, this principle limits the reach of judicial decrees to parties found liable for a legal violation. *See id.*

The Supreme Court's decision in *Milliken v. Bradley* is instructive. In that case, the Supreme Court held it beyond the limits of judicial power to interfere with the operation of entities that have not violated plaintiff's rights. *Milliken v. Bradley*, 418 U.S. 717, 744-45 (1974) [hereinafter *Milliken I*]. Accordingly, the Court vacated the interdistrict desegregation order at issue there precisely because it contemplated "restructuring the operation of local governmental entities that were not implicated in any constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 296 (1976) (interpreting *Milliken I*, 418 U.S. 717 (1974)). In sum, a legal violation is a "necessary predicate for the entry of a remedial order." *Id.* at 297.

Recognizing the ancient maxim that an entity may not be made the subject of a remedial decree absent some finding of liability, courts — since the days of *Marbury v. Madison* — have viewed remedial questions as the second prong of a two-step inquiry. A court first determines whether this defendant has wronged this plaintiff. Only if this antecedent inquiry is answered in the affirmative does the court speak to the remedial issue, asking "2d. If [plaintiff] has a right, and that right has been violated, do the laws of [t]his country afford him a remedy?" *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 154 (1803). Preserving the link between remedies and violations is not only a matter of avoiding unfair impositions on a party. It also expresses an important separation of powers principle, ensuring that court edicts are grounded in the requirements of law and not in notions of judicial policy. Court-ordered decrees therefore "exceed appropriate limits" when they are "imposed upon governmental units that were neither involved in nor affected by" the violation. *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) [hereinafter *Milliken II*].

We thus return to these first principles. For plaintiffs to prevail on their Title II claim, they must prove that some action attributable to the City caused them to "be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity," here the Richmond Public Schools. *See* 42 U.S.C. § 12132.

III.

Title II and its sister provisions implement Congress' "clear and comprehensive national mandate for the elimination of discrimination

against individuals with disabilities." *See* 42 U.S.C. § 12101(b)(1). A statutory violation is not limited to a finding of discriminatory intent. Rather, Title II prohibits discriminating against disabled persons in two ways. The provision first bars the exclusion of otherwise qualified persons with a disability from participating in or "receiving the benefits of the services, programs or activities of a public entity." *Id.* § 12132. It also bars a public entity from discriminating against an individual on the basis of disability. *Id.* To repeat, to prevail under Title II of the ADA plaintiffs must show either "that [they] w[ere] excluded from participation in, or denied the benefits of, a program or service offered *by a public entity*, *or* subjected to discrimination *by that entity*." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (emphasis added).

The district court in this case did not find that the City excluded plaintiffs from receiving the benefits of its services or programs or that the City had in any way discriminated against plaintiffs. To the contrary, the district court began by noting that it had "no intention of conducting a fault-finding inquiry." *Bacon II*, 419 F. Supp. 2d at 854. The court then found that Virginia's General Assembly had vested the School Board — "an independent municipal agency" — with "direct statutory accountability for compliance" with federal and state disability laws, *id.* at 855; that the School Board "directly controls" capital improvement projects, like the ADA remediation at issue here, *id.* at 854; and that the School Board alone decides how to allocate its budget, *id.* These findings led the court, in denying plaintiffs' motion for attorneys' fees, to conclude: "From a purely statutory perspective, the responsibility for compliance [with federal disability laws] resided with the City School Board, which has the duty to physically maintain the City schools. It was the School Board that breached its specific duty of compliance in this case." J.A. 4109. Accordingly, the district court properly found "no fault with the City." J.A. 4110.

Despite all this, the district court granted summary judgment to plaintiffs. The court ordered the City to "ensure that the Richmond City Public Schools become ADA-compliant within [five years]," and to provide "a reasonable, good faith appropriation to the School Board in the normal course of the budget process, sufficient to enable ADA compliance within the specified time frame." *Bacon II*, 419 F. Supp.

2d at 855. The district court reasoned that since the City provided funding to the Richmond schools it was a necessary party; thus evidence neither of fault nor of discrimination was "necessary to obtain equitable remedies under the ADA." *Id.* at 854.

We disagree. The district court's remedial order undermines the basic precept of law discussed above: that remedies may be imposed only on responsible parties. Injunctive relief may not issue where, as here, the City played no part in depriving any plaintiff of the rights guaranteed by the ADA. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976). To impose responsibility in the absence of fault and causation would stretch the law of remedies beyond limit. As for Title II, it cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them. A remedy unmoored to any finding of fault is not a remedy at all and we must therefore reverse the judgment.

## IV.

### A.

Plaintiffs contend nonetheless that fault is irrelevant because the City provides capital funding to the Richmond Public Schools. Plaintiffs thus hitch their wagon to the district court's finding that the City by virtue of its "power of the purse" bears some responsibility for correcting the ADA violations in the Richmond Public Schools. *See Bacon II*, 419 F. Supp. 2d at 854. But using the City's status as a funder to impose responsibility — in the express absence of fault and causation — presents several difficulties.

#### 1.

First, the City exercises no operational control over City school buildings or school services and activities. Virginia law vests the School Board with exclusive authority over Richmond's public schools. Article VIII, section 7, of the Virginia Constitution provides, "The supervision of the schools in each school division shall be vested in a school board." Va. Const. art. VIII, § 7; *see also Underwood v. Henry County Sch. Bd.*, 427 S.E.2d 330, 333 (Va. 1993);

*Bristol Va. Sch. Bd. v. Quarles*, 366 S.E.2d 82, 88 (Va. 1988). The Virginia Code implements this provision by establishing the Commonwealth's school boards as independent corporate bodies, Va. Code Ann. § 22.1-71, "given the responsibility by law of establishing, maintaining and operating the school system," *Bd. of Supervisors v. County Sch. Bd. of Chesterfield County*, 28 S.E.2d 698, 702 (Va. 1944); *see also* Va. Code Ann. § 22.1-79(2)-(3).

The School Board's operational authority over school property and programs is set forth in some detail. School boards must ensure that schools are "conducted according to law," Va. Code Ann. § 22.1-79(2), "[c]are for, manage and control" school property, *id.* § 22.1-79(3), and "provide for the erecting, furnishing, equipping, and noninstructional operating of necessary school buildings and appurtenances," *id.* The School Board's independence is further illustrated by its statutory authority to sue and be sued, *id.* § 22.1-71, hire employees, *id.* §§ 22.1-293, 22.1-295, insure school property and personnel, *id.* § 22.1-84, and pay claims, *id.* § 22.1-122. In short, "[t]he power to operate, maintain and supervise public schools in Virginia is, and has always been, within the exclusive jurisdiction of the local school boards." *Bradley v. Sch. Bd. of Richmond*, 462 F.2d 1058, 1067 (4th Cir. 1972).[1]

In stark contrast, the City of Richmond has no power to make physical changes to school buildings or control the day-to-day operation of local school buildings and their services and programs. With

---

[1] Virginia Code section 22.1-94 gives local governing bodies the authority to appropriate funds into "major classification" categories. And while the school board must expend classified funds "in accordance with such classifications," *id.* § 22.1-89, the City is without power to earmark funds for a particular project like ADA remediation. *Sch. Bd. of Chesterfield County*, 28 S.E.2d at 705; *see also* Va. Code Ann. §§ 22.1-94, 22.1-115.

Plaintiffs make much of the distinction between capital and other funds: they argue that the City is a necessary party because it is the "only viable source of capital improvements funding." But plaintiffs have identified no legal reason why the School Board cannot use other nonclassified funds received from the City or indeed funds received from the state or federal government for ADA remediation.

the exception of raising taxes and providing funding, the City is not "charged by law with the establishment, maintenance and operation of the public school system." *Sch. Bd. of Chesterfield County*, 28 S.E.2d at 702. It cannot dictate school services or programs. Indeed, the City cannot specify how the funds it appropriates to City schools may be spent: "[T]he exclusive right to determine how [appropriated funds] shall be spent is in the discretion of the school board so long as they stay within the limits set up in the budget." *Id.* at 705. To impose funding liability thus places the City between a rock and a hard place: The City must "ensure that the City schools become ADA-compliant within [five years]," but is powerless to control the expenditure of school funds.

The district court in this case noted, but failed to heed, the Commonwealth's decision to place primary responsibility for Virginia schools in the hands of local school boards. Instead, in an order that runs counter to the basic structure of Virginia law, the court made the City liable for funding. But this assumes that the City has the discretionary authority that could lead to a statutory infraction. For it is only the exercise of discretion in school operations that can result in a Title II violation. In short, the remedial order issued here ascribes to the City a discretionary function which local law precludes.

Such an ascription has profound implications. A State has near plenary authority to allocate governmental responsibilities among its political subdivisions. This power to structure its internal government is among those reserved to the Commonwealth by the Tenth Amendment. *See, e.g.*, *Bradley*, 462 F.2d at 1068. Needless to say, the federal court must in turn respect a State's division of responsibility.

Federal courts must tread with especial caution where, as here, a State's paramount interest in educating its children is at stake. Local control over the operation of public schools is one of our nation's most deeply rooted traditions — and for good reason. "[L]ocal autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to [the] quality of the educational process." *Milliken I*, 418 U.S. at 741-42. School authorities are granted substantial authority to formulate educational policy because they must balance so many competing interests. They are more in tune with educational exigencies — for example, the

competing needs for more labs, additional classrooms, new buildings, and repairs — than are federal courts. Thus, even where appropriate, "[r]emedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary." *Swann*, 402 U.S. at 16. Before a federal court may recalibrate the State's basic system of educational governance and conflate the functions of two very different entities, it must "take into account the interests of state and local authorities in managing their own affairs." *Milliken II*, 433 U.S. at 281.

To be sure, the States' near plenary power over political subdivisions may not be used as a subterfuge to avoid statutory or constitutional obligations. *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960). If state or local governments were to conspire to immunize themselves from ADA or other claims by dividing operational control and funding authority this would, of course, be evidence of discrimination. *See, e.g.*, *United States v. Bd. of Educ. of Chicago*, 11 F.3d 668, 673-74 (7th Cir. 1993); *James v. Duckworth*, 170 F. Supp. 342, 346-47 (E.D. Va. 1959), *aff'd*, 267 F.2d 224, 228 (4th Cir. 1959). If the City of Richmond "is at fault, it can be punished or enjoined; but a faultless third party cannot be." *Bd. of Educ. of Chicago*, 11 F.3d at 674.

In the case at hand, however, the separate corporate bodies established by Virginia law are no subterfuge; they were not intended to circumvent any federally created right. To the contrary, Virginia's longstanding division of authority serves legitimate state purposes. Virginia could certainly have concluded that to entrust the School Board and the City with the same responsibilities vis-a-vis education would be like one too many cooks stirring the broth. For the City to "exercise a large amount of control over the operation of the school system," would result in "a serious division of authority, which it would not seem the legislature would have intended." *Sch. Bd. of Chesterfield County*, 28 S.E.2d at 702. Such a system — with its overlapping jurisdiction, and finger pointing, and turf fighting — could lessen the accountability of public officials and decrease the transparency of school decisions. Virginia sought long before enactment of the ADA to avoid this morass through the creation of separate entities, and plaintiffs' invitation to blur the lines of educational authority must be declined.

## 2.

Plaintiffs' claim that the City alone bears financial responsibility for ADA noncompliance by virtue of its status as a funder of the local school system overlooks the fact that the Richmond School Board receives funding from other sources. Under Virginia Code § 22.1-88, the School Board draws on three main sources for the support and maintenance of its schools: state funds, federal funds, and local funds. To single out the City for responsibility when it is but one source of funds not only raises serious equitable concerns, but also demonstrates the breadth of the district court's theory of funding liability. Title II defines "public entity" to include "any State or local government." 42 U.S.C. § 12131(1)(A). Insofar as the district court relied upon the City's "power of the purse" to impose a remedy here, there is nothing to distinguish the City from state funding sources. But a State is not a necessary party based solely on its decision to fund schools. *See, e.g.*, *King v. Pine Plains Cent. Sch. Dist.*, 918 F. Supp. 772, 782 (S.D.N.Y. 1996) (New York State Department of Social Services was not a necessary party because, based on defendant's reasoning, "any number of state and federal agencies that are involved in funding the education of disabled children would be necessary parties").

To make funding entities responsible for the statutory violations of funding recipients would stretch the contours of Title II. Title II does not contemplate funding liability for an independent public entity that neither controls the challenged services nor discriminated against plaintiffs because of disability. It does not impose guarantor liability or make funding entities ADA insurers for funding recipients. To the contrary, the plain text of Title II limits responsibility to public entities that discriminate against or exclude persons with disabilities from the services, programs, or activities administered by the entity. Section 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities *of a public entity*, or be subjected to discrimination *by any such entity*." 42 U.S.C. § 12132 (emphasis added). To hold that a city or State by virtue of its funding authority is liable for injury caused solely by a separate and independent corporate body is a novel and unprecedented theory. It would also expose many different entities to extensive lia-

bility. For it will be the rare case where plaintiff will be unable to identify a source of outside funding.

Plaintiffs' theory of pass-through liability again upsets the balance of Virginia law. A grantor is not required to anticipate — on pain of liability — every sort of debt that its grantee might incur. To impose such a requirement here would be counterproductive from the standpoint of local schools. First, it might discourage funding. Funding entities compelled to anticipate every conceivable liability might be more cautious and circumspect about funding decisions, particularly where, as here, a city had no control over how its funds were spent. Second, an inordinate amount of red tape would be generated while experts and actuaries calculated the risks involved in the operation of local schools. This new regime, supplanting the established relationship of remedies to violations, would only burden funding for public education and undermine the public interest.

3.

Finally, plaintiffs' theory of funding liability would work a change in litigation incentives. No longer would settlement agreements be conducted at arms-length. Rather, armed with the knowledge that a third-party funder would be on the hook, administrators would have diminished reason to dispute liability. Plaintiffs could present wish lists for the system-wide remediation of schools, prisons, or other state functions and facilities. Administrators could then concede liability far in excess of statutory or constitutional requirements on the assumption that someone else would always pay. To so restructure litigation incentives might result in sweetheart consent decrees and settlement agreements that fail to reflect the arms-length bargaining upon which our legal system depends. But settlement agreements are "not to be used as a device by which A and B, the parties to the decree, can (just because a judge is willing to give the parties' deal a judicial imprimatur) take away the legal rights of C, a nonparty." *Bd. of Educ. of Chicago*, 11 F.3d at 673.

B.

Plaintiffs also argue that the City can be held liable because it owns the disputed school buildings and because it uses those buildings for

certain recreational programs and civic events. Title II, however, speaks not of ownership but of accessibility to "services, programs or activities." 42 U.S.C. § 12132. Where, as here, a city does not exercise any control over challenged services and activities, it is difficult to see how Title II applies. Had Congress wished to impose liability on public entities who own non-accessible buildings it could easily have said so. Title III, for example, imposes liability on both owners and operators of non-accessible public accommodations. 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability . . . by any person who *owns*, leases (or leases to), or *operates* a place of public accommodation.") (emphasis added). We must, of course, interpret Title II in accordance with what Congress has said.

Furthermore, under Virginia law, the City of Richmond is vested with bare legal title and thus the owner of school buildings in name only. Equitable title to school property rests in the hands of the School Board. It is the School Board that is "vested with the exclusive control of all school property . . . both real and personal." *Sch. Bd. of Chesterfield County*, 28 S.E.2d at 704; *see also* Va. Code Ann. § 22.1-125. This is true even where legal "title to such property is vested . . . in . . . a city." Va. Code Ann. § 22.1-125.B. Likewise, the School Board is the legal entity charged with the care, management, and control of school property. *Id.* § 22.1-79(3).

Nor are the City's limited functions at the Richmond Public Schools — such as the recreational programs offered by the Department of Parks, Recreation and Community Facilities — at issue in this case. Although plaintiffs challenged accessibility to City events at the summary judgment stage, they failed to provide any evidence of several elements of a Title II prima facie case: that (1) they were qualified to participate in the challenged events and programs, and (2) were "excluded from participation in or denied the benefits of such service, program, or activity." *Constantine*, 411 F.3d at 498.

Even if plaintiffs had established a prima facie case with respect to City events conducted at the Richmond Public Schools, the district court's chosen remedy ignores settled law. The system-wide retrofitment envisioned by the district court here does not comport with the Supreme Court's repeated mandates that injunctions must "be used

sparingly, and only in a clear and plain case," *Irwin v. Dixon*, 50 U.S. (9 Howard) 9, 33 (1850), and that "the nature of the violation determines the scope of the remedy," *Swann*, 402 U.S. at 16. The ADA's implementing regulations state: "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance." 28 C.F.R. § 35.150(b)(1) (2006). It is easy to envision a more narrowly tailored, and, thus more appropriate, means of curing inaccessibility to City events than the system-wide retrofitment of fifty-six school buildings. The City might, for example, be compelled to host such activities at locations that do not feature architectural barriers. *See id.*

Finally, plaintiffs claim that equitable remedies do not require any finding of fault under the ADA. We note at the outset that this court has never endorsed different liability standards based on the type of ADA remedy sought — and no such dichotomy can be found in Title II's text. In any case, while the Ninth Circuit has suggested that "equitable remedies for violations of the ADA are available regardless of a defendant's intent," *Midgett v. Tri-County Metro. Transp. Dist.*, 254 F.3d 846, 851 (9th Cir. 2001), that case did not go so far as to hold that a defendant who neither controls the challenged functions nor engages in any sort of discrimination may nevertheless be compelled to comply with a federal court order.

V.

None of this means that plaintiffs are without recourse. The School Board is, as noted, an independent corporate body with the authority to sue and be sued, to settle claims, and to enter into contractual arrangements. Va. Code Ann. §§ 22.1-71, 22.1-122. As with any contract, settlement agreements are generally enforceable against any signatory, including school boards. Thus the settlement terms ultimately reached by plaintiffs and the School Board as a result of arms-length negotiation are obligations on the part of the School Board.[2] Like-

---

[2]We say ultimately because the January 2006 Settlement Agreement was a contingent one, providing that the School Board's obligations depended on "the School Board receiving funding from the City of Richmond." We express no view as to whether this contingency has or has not been fulfilled.

wise, litigated judgments where liability and remedy are tailored to statutory requirements become legal obligations. Once School Board obligations are fixed in such fashion, the School Board can present — as with any other legal obligation or educational need — whatever ADA duties it has not only to the City but also to other funding entities.

There are many reasons to suppose that the City will not leave the School Board to struggle with its legal obligations or educational needs alone. Providing its constituents with a quality public education system is perhaps the City's most critical task. Thus City residents — the ultimate arbiters of electoral outcomes and consumers of City schools — have much to lose if funding is not forthcoming for educational needs. Indeed, under Virginia Code section 22.1-95, the City is "authorized, directed and required to raise money" to meet the Standards of Quality promulgated by the State Board of Education. *See* Va. Code Ann. §§ 22.1-95, 22.1-253.13:1, et seq.

For the federal courts to impose funding obligations upon the City in the absence of underlying legal violations simply short-circuits the legal and political process that states have put into place for the support of public schools. Law gives us no license to supplant these structures of self-governance with decrees writ large. *See Missouri v. Jenkins*, 515 U.S. 70, 102 (1995). For reasons stated heretofore, we reverse and vacate the judgment of the district court. On remand, the district court should enter summary judgment in favor of the City.[3]

---

[3]With respect to plaintiffs' other claims, the district court also made no findings that the City was liable for any statutory violation. Further, plaintiffs do not argue that the City receives education funds from either the federal or state government. Nor do plaintiffs dispute that both federal and state education funds flow directly to the School Board — the entity responsible, under Virginia law, for ensuring that City schools comply with state and federal disability law. *See, e.g.*, *Bentley v. Cleveland County Bd. of County Comm'rs*, 41 F.3d 600, 603 (10th Cir. 1994) (noting that the Rehabilitation Act requires "a sufficient nexus between the federal funds and the discriminatory practice"); *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) (noting that amendments to the Rehabilitation Act were not "intended to sweep in the whole state or local government, so that if two little crannies . . . of one city agency . . .

discriminate, the entire city government is in jeopardy of losing its federal financial assistance").

Because we reverse the district court's order granting summary judgment to plaintiffs and find that summary judgment should be entered in favor of the City we uphold the district court's denial of plaintiffs' petition for attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (party must prevail to be awarded attorneys' fees).